**SMEDRA v. STANEK et al.**

No. 4167.

United States Court of Appeals
Tenth Circuit.

March 8, 1951.

Rehearing Denied April 5, 1951.

Robert Swanson, Denver, Colo., for appellant.

Harold B. Wagner, Denver, Colo. (Carl A. Wyers, Denver, Colo., on the brief), for appellees.

Before PHILLIPS, Chief Judge, and HUXMAN and MURRAH, Circuit Judges.

HUXMAN, Circuit Judge.

Appellant, Zig Smedra, brought this action against Doctors Stanek and Matchett, for damages and expenses alleged to have resulted from negligent acts of the defendants in leaving "one or more sponges or pieces of surgical gauze in the person of the plaintiff" during an operation. The

jury returned a verdict for defendants. From the judgment on the verdict Smedra has appealed.

A number of assignments are urged for reversal. The decision, however, turns on one question—did the trial court err in excluding relevant and material evidence as hearsay.

Smedra suffered a serious injury to his spine which made it necessary to perform a delicate operation on his spine to immobilize one of his vertebræ. He was brought to St. Joseph's Hospital in Denver where the operation was performed March 6, 1948. The operation consisted of two phases. A Dr. Freed performed the first operation. He made an incision and removed the ruptured disk between the two vertebræ. After the disk was removed, appellees made an incision in the ilium, removed a portion of the bone therefrom, properly prepared and shaped it in the form of a letter "H", and inserted it between the two vertebræ where the ruptured disk had been removed. Appellees then closed the incision through which the portion of the bone of the ilium had been removed.

Smedra was released from the hospital March 27, 1948. Later the cast was removed and Dr. Stanek ordered a corset of steel to be worn. After he had worn the corset for ten or twelve days, his side became irritated in the area of the ilium incision. He took out two of the stays, but the condition became worse and he ceased wearing the steel corset. In July, 1948, he consulted Dr. R. W. Karrer of Minatare, Nebraska. Dr. Karrer examined the area over the ilium where the incision had been made and discovered an abscessed area. He made an incision about one-half inch long into the pus cavity, drained pus from the wound, inserted a hemostat and opened the wound so that it would drain. He put on a gauze dressing and bandaged the wound. Thereafter, he saw Smedra frequently. The incision he made did not heal and the drainage continued.

In September, 1948, Smedra returned to Denver and again consulted Dr. Stanek. He entered the hospital and submitted to an examination of the area through surgery. He was unconscious during the performance of the operation. Dr. Stanek removed a piece of surgical gauze from the wound at that time. Smedra was not told of the removal of this gauze. Smedra returned to his home, the wound still refused to heal, and Smedra continued to receive treatments from Dr. Karrer.

On April 26, 1949, Smedra was changing the dressing on the incision when he observed a string extending out of the incision. He removed it with a pair of tweezers. Three days later, while changing the dressing, he observed a piece of gauze protruding from the incision. He was unable to remove it because of the pain. He went to Dr. Karrer who removed a piece of surgical dressing about 10 inches long and 3 inches wide.

There was a great deal of evidence introduced with regard to the manner in which the operation was conducted, the kind and nature of surgical dressings in use at the hospital, as well as other evidence bearing upon the manner in which the operation was performed and the treatment received by Smedra from the appellee doctors. So also there was a great deal of evidence as to the suffering of Smedra and evidence which would tend to support a conclusion that the incision refused to heal because of some foreign substance in the wound. But since the question is not whether the evidence is sufficient to support a verdict for appellant or falls short of making a case in his behalf, no useful purpose would be served by recounting it in detail.

As stated, the sole question is whether the court erred in excluding certain evidence offered by appellant. Dr. Matchett, the other appellee, had testified by deposition that his recollection "was that Dr. Stanek had been told by someone in the operating room that the sponge count did not come out right." Appellant was not allowed to bring out this answer on trial. Dr. Stanek was asked and permitted to answer that there was a conversation in the operating room, the inference being that the conversation related to a sponge count. He was not permitted to state the substance of the conversation. Appellant then made an offer of proof, offering to prove that Dr

Stanek had been warned that the sponge count was off. This offer was refused on the ground that there had been no evidence that the sponge count had been taken and that in the absence of such proof the proffered testimony would be hearsay.

*Dr. Freed, who was one of the prominent* physicians and surgeons practicing in this hospital, testified that it was a common practice in this type of a case to have a sponge count taken; that the actual count was taken by the nurses in attendance and that its purpose was to prevent the loss of a sponge during the operation. He testified that a sponge count was taken at the close of his part of the operation. While he did *not specifically mention this hospital in his* testimony that it was common practice to take such a count, we think the inference that such was the practice in this hospital is properly deducible from what he said.

■ To establish liability, it was necessary to prove, first, that a sponge or gauze, or part thereof, was left in the incision, and, second, that it was left there as the result of failure on the part of the doctors to exercise that degree of skill and care required of practitioners in that environment.[1]

The relevancy of the excluded evidence was not to establish that a sponge count had been taken and that it failed to check out, nor, yet, was its purpose to establish that the doctor had knowledge that such a count had been taken. For that purpose, it would be hearsay and inadmissible. Its purpose was to warn the doctor that a sponge might have been left in the incision. The effect of the proffered testimony was the same as though the nurse had said, "Doctor, there must be a sponge in the wound because one is missing," or, if she had said, "Doctor, I think a sponge has been left in the incision."

■ For the purpose of establishing that this warning, with regard to the condition or possible condition of the incision was brought home to the doctor, the testimony was not hearsay and was admissible.[2] This evidence of a warning that a foreign substance might have been left in the incision is important on the question whether, in the light of this warning, the doctors thereafter exercised due care to ascertain that no foreign substance was left in the incision.

■ Appellant also offered to prove by Dr. Freed that after the operation, Dr. Stanek told him that he had been delayed because the sponge count did not come out correctly. This offer was likewise rejected on the ground that the proffered testimony was hearsay. The statement, if made by Dr. Stanek, certainly imports that he had knowledge or had received information concerning a sponge count and the result thereof, otherwise, he would not have made the statement. It was admissible on the theory that he would not have made the statement if it were not true since it was an admission against interest. The rule is well stated in Kitchen v. Robbins, 29 Ga. 713, 716, as follows: "Admissions do not come in, on the ground that the party making them, is speaking from his personal knowledge, but upon the ground that a party will not make admissions against himself unless they are true. The fact that he makes them against his interest, can be reasonably explained only on the supposition that he is constrained to do so by the force of the evidence. The source from which a knowledge of the facts is derived, is a circumstance for the jury to consider, in estimating the value of the evidence, but that is all."[3]

■ Appellant also complains of the court's refusal to question the jurors on

1. Michael v. Roberts, 91 N.H. 499, 23 A. 2d 361; Rice v. Tissaw, 57 Ariz. 230, 112 P.2d 866; Ingram v. Harris, 244 Ala. 246, 13 So.2d 48; Sansom v. Ross-Loos Medical Group, 57 Cal.App.2d 549, 134 P.2d 927.

2. Moen v. Chestnut, 9 Wash.2d 93, 113 P.2d 1030; McAfee v. Travis Gas Corp.,

137 Tex. 314, 153 S.W.2d 442; Nick Bombard, Inc., v. Proctor, D.C.Mun. App., 47 A.2d 405; Jones on Evidence, 3rd Ed., Sec. 330.

3. See also London Guarantee & Accident Co. v. Woelfle, 8 Cir., 83 F.2d 325, 335; Holman v. Boston Land & Security Co., 20 Colo. 7, 36 P. 797; 3 Jones on Evi-

voir dire with respect to any interest they might have in the United States Fidelity and Guaranty Company. The scope of inquiry on voir dire is largely discretionary with the trial court.[4] There is no showing in the record that any juror knew that the United States Fidelity and Guaranty Company was interested in the suit or defending it. Under these circumstances it cannot be said that the court's refusal to examine a jury with respect to this matter was such an abuse of discretion as to require a reversal.

Other assignments of error go to the court's instructions, but, in our view, they are without merit and need no further consideration.

The judgment is reversed and the cause is remanded to proceed in conformity with the views expressed herein.

dence, Sec. 1071, p. 1972; Salvitti v. Throppe, 343 Pa. 642, 23 A.2d 445, 138 A.L.R. 842; Mayhew v. Travelers' Pro-tective Ass'n of America, Mo.App., 52 S.W.2d 29.

4. Rains v. Rains, 97 Colo. 19, 46 P.2d 740.